## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF ILLINOIS
### WESTERN DIVISION

# F I L E D

MAR 2 8 2008

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

UNITED STATES OF AMERICA

v.

ISRAEL PILLADO, IRINEO GONZALEZ
ARTURO MORALES, CASIMORO HERNANDEZ,
and LEOBARDO LARA

CRIMINAL COMPLAINT

0 8 C R 5 00 1 7

CASE NUMBER:

(Name and Address of Defendants)

I, the undersigned complainant, being duly sworn, state the following is true and correct to the best of my knowledge and belief. Between March 17, 2008 and March 26, 2008 at McHenry, in the Northern District of Illinois, Western Division, and elsewhere, ISRAEL PILLADO, IRINEO GONZALEZ, ARTURO MORALES, CASIMORO HERNANDEZ, and LEOBARDO LARA, defendants herein:

(Track Statutory Language of Offense)

> did conspire with each other, to knowingly and intentionally distribute a controlled substance, namely 1000 kilograms or more of mixtures containing marijuana, a Schedule I Controlled Substance,

in violation of Title 21, United States Code, Sections 841(a)(1) and 846. I further state that I am a Immigration and Customs Enforcement ("ICE") Special Agent and that this complaint is based on the following facts:

**SEE ATTACHED AFFIDAVIT.**

Continued on the attached sheet and made a part hereof:  __x__ Yes  ____ No

Signature of Complainant
Jay Warran, Special Agent, ICE

Sworn to before me and subscribed in my presence,

March 28, 2008                    at    Rockford, Illinois
Date                                      City and State

P. Michael Mahoney, U.S. Magistrate Judge
Name & Title of Judicial Officer                    Signature of Judicial Officer

STATE OF ILLINOIS          )
                           )    SS
COUNTY OF WINNEBAGO        )

## AFFIDAVIT

I, Jay Warran, first being duly sworn, state the following under oath:

1.      I am a Special Agent with United States Immigration and Customs Enforcement (ICE) and have been employed by ICE (previously the United States Customs Service) for the past 5 years. I am currently assigned to the narcotics investigations group in Chicago, Illinois and have been so assigned since August, 2006. Prior to that I was assigned to the ICE office in Massena, New York, where I specialized in narcotics smuggling and money laundering as it relates to narcotics violations. I have received training in the structure of narcotics organizations, methods of narcotics smuggling/trafficking, and in narcotics-related investigations. I have attended the U.S. Criminal Investigator Training Program as well as advanced Special Agent training from ICE. I was a Police Officer in Champaign, Illinois for approximately six years from January 29, 1996 to April, 2002. I graduated from the Police Training Institute in April, 1996. My duties and responsibilities include, but are not limited to, the investigation of federal narcotics offenses under Title 21 of the United States Code.

2.      This affidavit is submitted in support of the attached complaint. Other federal and local law enforcement officers have participated in this investigation and I have discussed the results of their investigation into this matter with them. This affidavit is based in part upon those discussions as well as my own investigation and observations. I have reviewed this affidavit and its contents and it is true and correct to the best of my knowledge. This affidavit does not contain all of the information concerning the investigation that is known to me, but sets

forth only those relevant facts necessary to establish probable cause that the defendants committed the offense charged in the complaint. Unless specifically indicated, all conversations and statements described in this affidavit are related in substance and in part only.

3.      On March 17, 2008, Customs and Border Protection (CBP) officers working at the seaport in Charleston, South Carolina conducted a Smiths HVC and a VACIS (X-ray) inspection of overseas shipping container marked with serial number MEDU8030241 (hereinafter referred to as "the shipping container"). Anomalies led the inspectors to conduct a physical search of the shipping container. There were approximately 204 "Decorative Oven Mud Vases" inside cardboard boxes located in the shipping container. Based on X-ray searches and physical searches it was determined that every vase contained marijuana. Each vase contained approximately fourteen pounds of marijuana, and the entire shipment was estimated to contain approximately 2880 pounds of marijuana which is the equivalent of approximately 1,309 kilograms of marijauna.

4.      CBP Inspectors conducted initial testing of the green leafy substance secreted in the vases using a Reagents #908 marijuana field test kit. The field test kit indicated a reaction consistent with a positive reaction for the presence of marijuana. Under Title 21, United States Code, Section 812(c), marijuana is a Schedule 1 Narcotic Drug Controlled Substance.

5.      Based on shipping records provided to CBP and ICE agents, it was learned that the importer and ultimate consignee of record for the shipping container was an individual named Hector Alfonso Huerta (hereinafter "Huerta"). The records revealed that the shipment was to be ultimately delivered to "Hector Alfonso Huerta" at 1622 S. River Rd, McHenry, IL. The contact telephone number provided on the bill of lading is (773) 332- 3245. A second

2

telephone number was later provided by the shipping company as (317) 372- 9363. Based on a review of CBP records, CBP officers determined that Huerta is a first time consignee and had never imported before to their knowledge. According to Start Wireless, the cellular provider for (773) 332- 3245, the telephone is a prepay cellular telephone. Start Wireless does not keep subscriber records for their prepay cellular telephones.

6.     On Wednesday, March 19, 2008, the export services company that arranged for the shipping container to be imported to the United States attempted to call the consignee, Hector Alfonso Huerta, at the phone number on the manifest, (773) 332-9363, to arrange for the shipping container to be delivered. The export services company was not able to make contact and had to contact the export company, which is located in Mexico (hereinafter "export company"), for assistance. The export company contacted Huerta. Due to the delay in reaching Huerta, the company that was contracted to transport the shipping container from South Carolina to McHenry, Illinois (hereinafter "shipping company") informed Huerta that the shipping container would not be delivered until after the holiday weekend (Easter).

7.     After the marijuana was discovered in the shipping container by CBP agents, it was secured in the custody of CBP and ICE agents. The shipping company transported the shipping container from South Carolina to the Chicago ICE office on March 24, 2008. ICE agents kept the container under constant surveillance during its transport from South Carolina to the Chicago ICE office.

8.     On March 25, 2008, pursuant to a court order, electronic transmitter and trigger devices were installed inside the cardboard boxes. These transmitter and "trigger" devices were subsequently monitored by agents. A box was taken off the shrink-wrapped stack and purposely

3

broken and placed on the floor of the container, exposing a broken vase and two bricks of marijuana.

9.      On or about March 25, 2008, an Undercover ICE agent (UCA) attempted to contact Huerta at (773) 332- 3245 to make arrangements for the delivery of the marijuana-laden "Decorative Oven Mud Vases". The phone number went straight to voicemail and the voicemail box was full. The UCA was unable to leave a message. The export services company again contacted the export company which provided another phone number for Huerta, (317) 372-3245. The export services company again made contact with Huerta.

10.     On March 25, 2008, at approximately 2:50 p.m., ICE agents, utilizing the UCA, attempted to deliver the shipment of marijuana-laden "Decorative Oven Mud Vases" to 1622 River Rd, McHenry, Illinois.

11.     After the UCA arrived at 1622 River Rd, McHenry, IL, the UCA placed several recorded phone calls to a male who identified himself as Hector Huerta at (317) 372 - 3245, and made arrangements with Huerta to deliver the marijuana laden "Decorative Oven Mud Vases" to 1622 River Rd, McHenry, IL. Huerta stated that he had people on the way to unload the container. Over the next seven (7) hours, the UCA waited for Huerta or his designee to arrive making numerous phone calls between the UCA and Huerta. During those conversations another phone number was given to the UCA, (702) 208-0222. This was reported to be the phone number of a woman named Maria. Maria told the UCA that she was enroute to 1622 River Rd, McHenry and that she was bringing "some" people to unload the container. She further stated that she did not know where she was going and asked for directions during several of the phone calls. During several of the phone calls with Huerta and Maria, the UCA informed

4

them that after two hours of unloading time, they were required to pay the driver seventy- five dollars ($75) per hour for down time. Huerta and Maria agreed to this.

12.    At approximately 9:00 p.m., Maria arrived at 1622 River Rd, driving a Maroon Suburban with Illinois registration 7423746. Another male, later identified as Manuel Gomez, was sitting in the passenger's seat. A Hispanic male, later identified as Irineo Gonzalez. Gonzalez did not speak English. Maria stated that Gonzalez was going to unload the truck by hand as he did not have access to a forklift as previously stated by Huerta. Maria stated that she needed to leave and would not stay for the unloading of the truck. Gomez also refused to stay to help unload the container. At one point, Maria stated that she did not want to "get in trouble" for being there. Gonzalez stated, through Maria translating, that he would unload the truck by himself and just leave the cargo on the dirt ground, as they did not have a rental unit to store the cargo.

13.    The UCA then told Maria that this arrangement was unacceptable and he would return the following day at noon for them to unload. The UCA also told Gonzalez, using Maria as a translator, that the fee for down time today was four hundred and fifty dollars ($450). Gonzalez took out four hundred dollars ($400) from his front pants pocket and paid the UCA stating that he would pay the rest the following day.

14.    On Wednesday March 26, 2008, the UCA made several phone calls to Maria's telephone, (702) 208- 0222 starting at approximately 9:30 a.m. A male, who spoke English and identified himself as Hector, stated that they would have people at the River Rd address at noon on March 26, 2008.

5

15.     The UCA arrived at the 1622 River Rd address at approximately 12:45 p.m. No one was located to unload the container and several calls were made to Huerta at (702) 208-0222. Huerta stated that he was very close, within a couple of miles and would be there shortly. Over the course of the next several hours, Huerta made several excuses as to why they had not yet arrived, including that their driver got lost.

16.     At approximately 3:30 p.m., the ICE undercover operation was terminated and the UCA left the parking lot. Approximately 15 minutes later, Huerta called stating that he was at 1622 River Rd. The UCA returned to the parking lot.

17.     The UCA observed a white cargo van with Illinois temporary license 754J387 parked near where the truck had been previously parked with two males inside. The UCA recognized the passenger of the van as Gonzalez from the previous night. Another male, later identified as Israel Pillado, was sitting in the driver's seat of the white van. The UCA asked Pillado, "are you Hector?" Pillado stated that he was Hector's brother. Gonzalez signed for the shipment. Gonzalez, Pillado, and a local businessman (hereinafter "businessman") spoke for a short time in Spanish and Pillado started to back the van out of the parking lot. The UCA asked the businessman where Pillado was going. The businessman stated that he was under the impression that the shipment belonged to Pillado's brother and that the brother was lost on his way to this address. The businessman later stated that Pillado was going to pick up the owner of the shipment.

18.     The Customs Seal was then cut and the container was opened. Gonzalez jumped in the back of the truck and started to look into the opened/broken box that the UCA had previously placed in the shipping container. Three other individuals, later identified as Arturo

6

Morales, Casimoro Hernandez and Leobardo Lara, also gathered around the box and looked inside. Gonzalez moved the box to get better access to the opening. Hernandez, reached into the open box and grabbed one of the bricks of marijuana and showed it to Gonzalez, Lara and Morales. Hernandez placed the brick back in the box. Gonzalez attempted to hide the bricks of marijuana by turning the open part of the box to face the wall. Gonzalez then reached in the box and pulled a brick out of the box and tossed it to Lara. Morales took the brick from Lara and held it as if to see how much it weighed. Morales then wiped the brick with his shirt sleeve as if he was wiping off his fingerprints and he began to laugh. Lara then placed the brick back in the box. Gonzalez, Lara, Morales, and Hernandez stood next to the truck and spoke in Spanish for several minutes, appearing to be in negotiations. The businessman stated he knew that what was in the container was illegal and he got in his truck. Before he left, the businessman told the four men that he was going to call the property's landlord. Hernandez took a closer look inside the opened box and all of its contents. Eventually Hernandez took one of the bricks of marijuana out of the first box and hid it under one of the landscaping trucks next to the shipping container.

19.    Throughout the course of the offloading, Hernandez, took eight (8) bricks of marijuana and hid them in various places around the parking lot.

20.    Morales, Lara, and Hernandez, then began to unload all 18 pallets from the container. The three men used a bobcat-style machine, that belonged to Lara's landscaping company, as a forklift. Gonzalez acted as a supervisor.

21.    At one point, Lara, who was driving the forklift, dropped one of the pallets, breaking several of the boxes open onto the ground. Gonzalez came over to look at the damage

7

with Hernandez. Gonzalez made a motion with his hands consistent with "let's go" or "hurry up". Lara then used the forklift to move the fallen pallet so that he could continue to unload.

22.     Once the truck was unloaded, Gonzalez paid the UCA five hundred dollars ($500) for the down time, even though only three hundred and seventy- five dollars ($375) was requested.     The UCA then left with an empty container.     ICE agents maintained constant surveillance on the boxes.

23.     Shortly after the UCA left, Pillado returned driving the same white cargo van. A second vehicle, a blue GMC Envoy, IL temporary tag 673J929, followed him into the parking lot. A Hispanic male exited the vehicle (hereinafter "Individual A"). He spoke to Pillado and Gonzalez for a couple of minutes. Individual A then got on the telephone and started to walk away from the Pillado and Gonzalez toward the south of the lot. At one point, while still on the phone, he stopped within ten (10) feet of the boxes and looked at them. He then walked away and got into his vehicle. Pillado got into his vehicle and the two vehicles left.

24.     At approximately 5:45 p.m., a traffic stop was conducted on Individual A's and Pillado's vehicles in the village of Wauconda.     Inside Pillado's cargo van was an Illinois temporary registration paperwork for Pillado's van listing "Alfonso Huerta" as the purchaser of the vehicle with an address of 2724 Keeler, Chicago, IL. The consignee of the container was listed as "Hector Alfonso Huerta. Pillado was advised of his *Miranda* rights and agreed to speak with the agents. Pillado stated that he lives at 2724 Keeler. Pillado admitted that the white cargo van belonged to him. Pillado said he recently purchased the van for $1900. Pillado and Gonzalez stopped at a Currency Exchange to purchase the Illinois temporary registration earlier on March 26, 2008. Pillado said that Gonzalez paid for the license plates and Gonzalez put the

8

name "Alfonso Huerta" on the paperwork. Pillado never entered the currency exchange. Pillado said that he just met Gonzalez at approximately 10:00 a.m. on March 26, 2008. Pillado said that he and Gonzalez were the only two people in the van. Pillado also stated that he never used Gonzalez phone, number (702) 208- 0222 (hereinafter "Gonzalez's phone"). Pillado later recanted his earlier statements and admitted that he did talk to the UCA on Gonzalez's phone. While on the phone with the UCA, Pillado claimed to be Hector Huerta. However, Pillado stated that Gonzalez was actually telling Pillado what to say, even though Gonzalez does not understand English. Gonzalez further stated that Individual A introduced Gonzalez to Pillado and asked Pillado to take Gonzalez to McHenry, because Gonzalez needed a ride. Pillado knew that Individual A was planning to go to McHenry also, but did not question why Gonzalez could not ride with Individual A. Pillado knew that Gonzalez was going to unload a shipping container. On the ride up to McHenry, Pillado realized that whatever was inside the shipping container was "big" (highly) illegal. He believed it to be drugs or guns. Pillado continued to drive Gonzalez after realizing that there were illegal items in the trailer because he had given his word that he would do so. When asked who Alfonso Huerta was, Pillado said that he believed that Huerta was the individual who was in charge of the whole shipment.

25.     At approximately 5:45 p.m., Morales, Gonzalez, Lara, and Hernandez were taken into custody at 1622 River Rd, McHenry, Illinois.

26.     After Gonzalez was arrested, ICE agents advised Gonzalez of his *Miranda* rights and Gonzalez agreed to talk to the agents. Gonzalez stated that he has only been in the United States since September. Gonzalez said that he is originally from Guadalajara, Jalisco, Mexico. Shipping records show that the shipping container was shipped out of Jalisco, Mexico. Gonzalez

9

stated that he came to Chicago approximately eight (8) days ago which is approximately when the shipment was supposed to be shipped to Chicago. Gonzalez said that he was been staying in a hotel in Chicago, paying $50 per night on average, while he looked for work. Gonzalez said he also had been looking for a cousin he had not seen or spoken to in seven (7) years. Gonzalez did not know his cousin's address or phone number or how to find her. Gonzalez said that he was going to call his uncle the following day about how to find his cousin. Gonzalez stated that he met Pillado at approximately noon on March 26, 2008 when Gonzalez walked from his hotel to a restaurant parking lot where Pillado picked him up. Gonzalez later stated that a dark skinned Hispanic man actually drove him to meet Pillado. The dark skinned Hispanic man was the man who offered him the job of unloading the container, although he does not know his name or how to find him. He also stated that Pillado was the person that informed him that he would be unloading a shipping container full of pots. Gonzalez asked Pillado if there was something in the pots. When asked why he would ask that question, Gonzalez denied thinking that there was anything in the pots. Gonzalez said that he was not sure if there was anything illegal inside the pots. Gonzalez further stated that when the dark skinned Hispanic man picked him up on March 26, 2008 and told him about the shipping container, that was the first time that he had heard about unloading the container. When agents reminded Gonzalez that he had been at 1622 River Road, McHenry, Illinois on March 25, 2008, Gonzalez later stated that he had learned about unloading the container on March 25, 2008 at approximately 3:00 p.m. Gonzalez said that once he saw that the bricks inside the box, he knew that there was marijuana inside the container. Gonzalez said that he wanted to leave but did not. Gonzalez said that there was supposed to be more trucks coming at 6:00 p.m. to load up the boxes and take them somewhere else, although

10

he did not know where. Gonzalez said that the person who arrived with the trucks was the person who was going to pay Lara, Hernandez, and Morales. Gonzalez refused to say who he was talking to on the phone when the other three men were unloading the truck.

27.     When Lara was arrested he was in possession of a loaded .38 caliber revolver. Lara was also in possession of an Illinois FOID card (Firearm Owner Identification card), which appeared to be obtained illegally because it was determined that Lara is an illegal alien. Lara was advised of his *Miranda* and agreed to speak with the ICE agents. Lara said that he has been in the United States since 1984, when he entered illegally. Lara claims that he "took care of" his paperwork in 1986 and is now a legal citizen. However, records checks of Immigration systems show no record of Lara being in this country legally. Lara further stated that he knew that the shipping container contained marijuana when he saw what was inside the broken open box. While they were unloading the container, Morales, Hernandez, and Lara were talking about how much marijuana was inside. At one point, Lara asked Gonzalez what was inside the container. Gonzalez told him that there might be drugs inside. When Lara dropped the pallet of boxes, Gonzalez didn't care, he just wanted to hurry up and get the truck unloaded.

28.     Casimiro Mora Hernandez was also arrested. ICE agents advised Hernandez of his *Miranda* rights and he agreed to speak with the agents. Hernandez said that as soon he saw what was inside the first broken box, Hernandez knew that there was marijuana in the container. Hernandez said that he was supposed to be paid although he was never told how much he would receive. He believed he would get around $100. Lara, Hernandez, and Morales were talking about how much marijuana appeared to be in the truck, while they were unloading the container. Hernandez admitted to taking 8 bricks of what he believed to be marijuana and hiding them

11

around the yard. He decided that he would keep these bricks, although he didn't know what he was going to do with them.

29.    Arturo Morales was also arrested. After Morales was arrested, ICE agents advised him of his *Miranda* rights and Morales agreed to talk to the agents. Morales said that when he saw the bricks in the box, he was not sure what the bricks were, although he thought it might be illegal. Morales denied wiping his fingerprints off of one of the bricks of marijuana. Morales stated that he was going to be paid two hundred dollars ($200) to unload the truck. He believed that Hernandez and Lara would also be paid similar amounts.

30.    Based on the foregoing, there is probable cause to believe that Israel Pillado, Irenio Gonzalez, Casimiro Hernandez, Arturo Morales, and Leobardo Lara have violated 21 U.S.C. § 846.

FURTHER AFFIANT SAYETH NOT.

JAY WARRAN, Special Agent
U.S. Department of Homeland Security
Immigration and Customs Enforcement

Subscribed and sworn to before me
This 28th day of March, 2008

P. Michael Mahoney
United States Magistrate Judge

12